**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

JILLIAN JOHNSON,

      Plaintiff,

v.

LARIMER COUNTY SHERIFF'S OFFICE,

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Jillian Johnson, by and through her counsel, Paula Greisen and Scott Medlock of GREISEN MEDLOCK, LLC and Kimberly Jones of JONES LAW, LLC, submits her Complaint and Jury Demand against Defendant Larimer County Sheriff's Office, as follows:

**<u>INTRODUCTION</u>**

1.    Jillian Johnson spent years working toward her goal of becoming a law enforcement officer. She was thrilled when she was hired as a Jail Deputy by the Larimer County Sheriff's Office ("Defendant") in May 2022. Having every reason to believe that she would enjoy a long and successful career there, she relocated with three of her children from Texas to Colorado for the job. Deputy Johnson is hearing-impaired and required reasonable accommodations to be able to hear and effectively communicate in the noisy jail environment.

2.    Despite her request for accommodations, Defendant failed to investigate or provide Deputy Johnson with any accommodations or engage in the interactive process. Instead, as part of its policy or practice of discrimination against deaf or hearing-impaired deputies, Defendant

directed Deputy Johnson to secure her own auxiliary aids at her own expense. When Deputy Johnson was unable to do so and requested reassignment to a vacant position, Defendant refused to consider her for reassignment to a comparable position, all of which created an unsafe and intolerable working environment. As a result, Deputy Johnson's employment was constructively terminated on or about November 16, 2022 and she was forced to break her lease in Colorado and return to Texas with her three children.

3.      Defendant's discriminatory conduct violates the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq*., as amended ("ADA") and has caused Deputy Johnson significant damages.

## PARTIES

4.      Deputy Johnson is an individual now domiciled in Keller, Texas. During some or all relevant time periods, Deputy Johnson was employed by Defendant as a Jail Deputy in Larimer County, Colorado and was domiciled and resided in Windsor, Colorado.

5.      Deputy Johnson has a substantial hearing loss in both ears in the speech range and at high frequencies that affect her daily life activities. She also has a record of this disability. During all relevant time periods, Deputy Johnson was a qualified individual with a disability within the meaning of the ADA.

6.      Defendant Larimer County Sheriff's Office is a local governmental entity which provides law enforcement and detention services for the citizens of Larimer County, Colorado. Defendant's principal place of business is located at 2501 Midpoint Drive, Fort Collins, Colorado 80525. During all relevant time periods, Defendant employed more than 400 regular employees and was an "employer" as defined by the ADA.

**JURISDICTION AND VENUE**

7.      This action arises under the laws of the United States and the State of Colorado, including Article III, Section 1 of the United States Constitution.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1343 and 1337(a), 42 U.S.C. § 1988, as amended by the Civil Rights Attorney Fee Award Act of 1976. This action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-5(f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant resides in the State of Colorado and a substantial part of the events or omissions giving rise to the claims occurred in the State of Colorado, within the jurisdiction of the United States District Court for the District of Colorado.

9.      All conditions precedent to a private enforcement action under the ADA have been satisfied. Deputy Johnson timely filed Charges of Discrimination alleging discrimination in violation of the ADA against Defendant with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC"). More than 180 days have elapsed since the Deputy Johnson's Charges of Discrimination were filed. Deputy Johnson received a Notice of Right to Sue letter from the CCRD with a mailing date of November 13, 2023 and from the EEOC with a mailing date of December 5, 2023. This Complaint and Jury Demand is being filed within 90 days of mailing of both Right to Sue letters.

## FACTUAL ALLEGATIONS

10.     Defendant provides law enforcement and detention services for the citizens of Larimer County, Colorado, including operation of the Larimer County Jail (the "Jail") located in Fort Collins, Colorado.

11.     Some of Defendant's employees and some members of the public and the detainee population Defendant serves are deaf or hearing-impaired.

12.     In May 2015, the United States Department of Justice ("DOJ") received a complaint from a hearing-impaired detainee alleging that Defendant failed to effectively communicate with her during her incarceration. The DOJ opened a Compliance Review in response to that complaint to investigate Defendant's compliance with its obligations under the ADA to provide appropriate auxiliary aids and services whenever necessary to ensure effective communication with qualified individuals who are deaf or hearing-impaired.

13.     As a result of the complaint, Defendant entered into a Settlement Agreement ("Agreement" or the "DOJ Agreement") in or about May 2017 following the DOJ Compliance Review. In it, Defendant agreed to ensure that "appropriate auxiliary aids and services" are made available to individuals with hearing impairments "when such aids and services are necessary to ensure effective communication" in the Jail.

14.     Defendant also agreed to designate an employee as its "ADA Coordinator" to serve as its "primary point of contact for [any] issues arising under the ADA," including "coordinating requests for accommodations, including auxiliary aids and services, from persons with disabilities."

15.     Upon information and belief, Deputy Chris Smith has been Defendant's designated ADA Coordinator since October 2019.

16.     The Agreement also required Defendant to provide an "effective visual notification system" to prevent hearing impaired individuals from missing announcements, alarms, or any other auditory information, including emergencies, in the Jail solely because of their hearing disabilities.

17.     Defendant was also required to train all of its deputies "as to effective communication" with deaf or hearing-impaired individuals in sufficient detail that they could comply with the ADA and effectively implement all provisions of the Agreement.

18.     Jillian Johnson is a 44-year-old hearing-impaired mother of five children, three of whom are still very young. She was diagnosed with substantial hearing loss in both ears approximately seven years ago. To effectively hear and communicate, she reads lips and wears hearing aids. She must rely on auxiliary aids to hear and communicate in noisy environments and in situations when she is unable to see the speaker to be able to read lips.

19.     Deputy Johnson holds Associate's and Bachelor's degrees in Criminal Justice. She earned these degrees in pursuit of her longtime goal of working in law enforcement.

20.     In 2021, Deputy Johnson was living in Fort Worth, Texas and was looking for employment.

21.     During her job search, she saw a job advertisement for a full time Jail Deputy position with Defendant at the Jail in Fort Collins, Colorado.

22.     To qualify for the Jail Deputy position, applicants were required to have a high school diploma or GED, be at least 21 years of age, hold current first aid and community CPR

certifications, possess a valid Driver's License, and have no disqualifying criminal convictions. Applicants also had to be legally authorized to work in the United States and to not have used illegal drugs within the five years preceding their application.

23.     The job description contained an illustrative list of the duties and responsibilities of the job, which included (but were not limited to): exercising direct supervision over and managing the detainee population housed at the Jail, processing and releasing detainees, effectively communicating including via radio and otherwise, performing searches, restraining and/or pursuing detainees, performing crisis intervention activities and conducting video and audio surveillance.

24.     Deputy Johnson met all of the listed qualifications for the position. Her Criminal Justice degrees and prior work experience gave her the skills, experience, and education to perform the job duties of the Jail Deputy position.

25.     Hearing and effectively communicating are essential functions of the Jail Deputy position.

26.     Defendant prominently displays the following policy notice on its website, including on the "Careers" page where job advertisements for Jail Deputies and other positions are posted:

### Notice of Policy Under the Americans with Disabilities Act

Per the Americans with Disabilities Act (ADA), Larimer County will provide a reasonable accommodation to qualified individuals with a disability who need assistance. Services can be arranged with at least seven business days notice. "Walk-in" requests for auxiliary aids and services will be honored to the extent possible but may be unavailable if advance notice is not provided. Please visit our Accessibility page to learn more.

27.     Deputy Johnson was reassured by Defendant's stated commitment to providing reasonable accommodations to qualified individuals with disabilities and believed she could perform the essential functions of the Jail Deputy position, including those related to hearing and effectively communicating, with reasonable accommodations for her hearing impairment.

28.     Deputy Johnson applied for the Jail Deputy position and was selected to participate in Defendant's pre-employment hiring process. Among other things, that process required Deputy Johnson to submit a pre-employment questionnaire, successfully complete a written test and an oral board interview, pass a physical agility test, pass an in-depth background and polygraph examination, complete a Captain's interview and successfully pass a psychological test and a pre-employment medical and drug screening.

29.     Some portions of the hiring process, such as interviews and the physical examinations, required Deputy Johnson's physical presence in Colorado to complete.

30.     Accordingly, Deputy Johnson traveled from her home in Texas to Fort Collins, Colorado at her own expense on multiple occasions between November 2021 and January 2022 to complete those portions of the hiring process.

31.     On at least one occasion, Deputy Johnson participated in a virtual interview over Zoom. During at least some of her virtual and in-person interviews, Deputy Johnson was wearing her hearing aids.

32.     When Deputy Johnson sat for her polygraph examination as part of the hiring process, she advised the individual administering the test ahead of time that she needed him to speak loudly so that she could hear him.  She told the person asking the questions that she was glad she could sit in a position that allowed her to hear the questions more clearly.

33.     During one of her trips to Colorado, on or about January 21, 2022, Deputy Johnson completed her pre-employment medical examination. As part of it, she underwent a physical, which included a hearing test.

34.     When Deputy Johnson arrived for her physical, she advised Defendant's employees, Sergeant Mirela Tutundzic and Human Resources representative Kari Valdez, that she needed the individuals administering the examination to speak loudly so she could hear the instructions.

35.     During that same trip, Deputy Johnson also underwent the hearing test (an "Audiogram"), which was administered at Defendant's behest by its chosen medical provider, Concentra Medical Centers.

36.     Concentra indicated that there was "[e]vidence of high frequency hearing loss" and "[e]vidence of hearing loss in the speech range" in both Deputy Johnson's left and right ears. Concentra also indicated that Deputy Johnson required ear protection "at 85 [decibels]."

37.     After that hearing test, Concentra indicated that Deputy Johnson was able to work without limitations or restrictions. Concentra did not indicate whether Deputy Johnson required accommodations for her hearing impairment in order to do so.

38.     Concentra provided the results of Deputy Johnson's Audiogram to Defendant.

39.     Deputy Johnson continued to progress through the hiring process. She was notified that she had successfully completed it in or about April 2022 and was offered the job working at the Jail.

40.     Deputy Johnson turned down another job opportunity to accept the Jail Deputy position with Defendant and relocated at her own expense with three of her children from Texas to Colorado for the job.

41.     She was formally appointed and sworn in as a Jail Deputy for Defendant on May 5, 2022.

42.     Following her appointment as Jail Deputy, Deputy Johnson commenced training for the position through Defendant's training academy, which consisted primarily of classroom-type instruction. Her training program began in or about May or June 2022.

43.     Sergeant Mirela Tutundzic was Deputy Johnson's direct supervisor. She also reported to other superior officers during her employment, including but not limited to Sergeant John Harteker and training officers Corporal Toby Williamson and Corporal Joshua Wheeler.

44.     Upon information and belief, some or all of Deputy Johnson's supervisors were employed by Defendant while the DOJ Agreement was in effect, and therefore should have received detailed training regarding effective communication with hearing-impaired individuals and Defendant's obligations under the ADA regarding such individuals.

45.     Upon information and belief, Sergeant Harteker sent an email to one of Deputy Johnson's training officers, Deputy Michael Butts, near the beginning of Deputy Johnson's training acknowledging Deputy Johnson's hearing impairment and instructing Deputy Butts to grade her and treat her the same as her non-hearing-impaired counterparts, despite her disability.

46.     The training classroom environment was relatively quiet. Notwithstanding her hearing impairment, Deputy Johnson was able to communicate and hear well enough during the

training classes with the assistance of her lip-reading skills and/or hearing aids to successfully complete those portions of the training.

47.     After the classroom portions of the training, Deputy Johnson was required to perform training exercises in the Jail.

48.     The Jail is often a noisy environment.

49.     Jail deputies must be able to hear and effectively communicate in the Jail to ensure officer and detainee safety.

50.     Communications over Defendant's radio and intercom systems in the Jail are delivered aurally, and the recipient of the communication cannot see the speaker.

51.     Because Deputy Johnson was unable to see the speaker when receiving aural communications in the Jail, including but not limited to those communications which were conveyed over the radio and intercom systems, Deputy Johnson was unable to read lips to assist with her hearing impairment on those occasions.

52.     Deputy Johnson was unaware of any visual notification system in the Jail that could assist her with hearing and effectively communicating in that environment, even though the DOJ Agreement required Defendant to have installed one prior to Deputy Johnson's employment to ensure that hearing-impaired individuals were alerted to important announcements, alarms and other auditory communications.

53.     Accordingly, Deputy Johnson was unable to hear or timely respond to communications in the Jail and required extra time and assistance from her training officers and colleagues to perform her job duties.

54.    For example, on at least two occasions during her training, Deputy Johnson failed to timely provide detainees with their medically necessary inhalers because she was unable to hear the detainees asking for them over the intercom system.

55.    Her supervisors and training officers observed that Deputy Johnson was having difficulty hearing radio traffic, hearing and understanding the detainees over the intercom system, hearing alerts notifying her that it was time to conduct status walks, hearing other officers through the "mini-control window" at the Jail, and hearing detainees attempting to get her attention in the housing area.

56.    Deputy Johnson's training records indicate that on July 18, 2022, Deputy Johnson "struggled to hear her radio traffic" and to "respond to notifications of [detainee] movement," even after requesting that other deputies repeat themselves "multiple times."

57.    On August 7, 2022, "Deputy Johnson state[d] she was having a hard time understanding what [detainees] say over the intercom." Her training officer acknowledged that there was a lot of background noise, but rather than engage in discussions with her to investigate and provide accommodations to assist her with her hearing impairment, the training officer merely suggested that "the more she converses with the [detainees], the more she will likely understand what they are asking her for."

58.    On August 14, 2022, Deputy Johnson's training officer noted that "[a]t times, she has a harder time understanding the [detainees] over the intercom," and suggested that if there "does not appear to be an emergency," she can "always talk to the [detainee] on her next status" to find out what they were saying. The training officer did not indicate what Deputy Johnson

should do if she was unable to hear an emergency communication or if she could not determine whether a particular communication was pertaining to an emergency.

59.     On September 4, 2022, Deputy Johnson "missed radio traffic" from one of the housing units requesting her assistance twice, and "control then called her radio number" to get her attention.

60.     On September 11, 2022, Deputy Johnson's training officers noted in her training records that there were "a couple transmissions" that "she didn't catch the first time," and that had to be conveyed a second time before she heard them.

61.     On September 27, 2022, during roll call for medication rounds, Deputy Johnson failed to hear the jail nurse calling another detainee, which caused a delay in the medication administration process. The nurse expressed frustration with Deputy Johnson because she was unable to hear her calling for the detainee the first time. Deputy Johnson's training officer refused her request for assistance on this occasion, explaining that he wanted "her to be able to work through these situations" on her own. Deputy Johnson had to move closer to the nurse and ask the nurse to look at her while she was speaking so that she could read her lips to be able to hear the communication.

62.     On October 18, 2022, Deputy Johnson did not hear one of her supervisors directing her through the mini-control window to assist with an uncooperative detainee, and as a result, did not provide the assistance she was directed to provide.

63.     On October 19, 2022, Deputy Johnson was unable to hear alerts indicating that it was time to conduct a status walk in the Jail to check on detainee safety and perform a detainee count. Deputy Johnson's training officer discussed this issue with her and directed her to "find

some sort of watch" on her own and at her own expense that could alert her through vibration that it was time for a status walk, "since she ha[d] difficulty hearing the alert sounds." Defendant did not offer to obtain this auxiliary aid for Deputy Johnson or explain how such a device might work in connection with Defendant's existing alert systems.

64.     On or about October 26, 2022, Deputy Johnson was unable to hear multiple detainees who were standing at the entry door to the housing area waiting to come into that area. Her training officer observed her inability to hear the detainees attempting to get her attention but did not assist her. Instead, he motioned to the detainees to keep trying to get Deputy Johnson's attention and noted in Deputy Johnson's training records that it took "approximately 30 seconds" before they were "finally able to draw her attention."

65.     That same day, Deputy Johnson also did not hear radio traffic regarding detainees returning from the kitchen to the housing area, and her training officer was required to relay the message to her "due to the delay in her response."

66.     On November 7, 2022, Deputy Johnson again "expressed difficulty towards being able to communicate with the detainees through the intercom systems," and her training officer noted that there were "multiple occasions that she required assistance in verifying what the [detainee]'s responses were."

67.     On at least one occasion, Defendant marked Deputy Johnson down in her training assessments because of the difficulty she was having hearing and effectively communicating in the loud jail environment.

68.     Deputy Johnson repeatedly requested accommodations for her hearing impairment during her employment.

69.     For example, on or about May 29, 2022, Deputy Johnson contacted her supervisor, Sergeant Tutundzic, and explained that she was having difficulty hearing the radios in the Jail. Subsequently, she met with one of her training officers, Corporal Wheeler, regarding the difficulties she was having hearing in the Jail. She asked Sergeant Tutundzic and Corporal Wheeler for assistance to help her hear in that environment.

70.     Sergeant Tutundzic and Corporal Wheeler did not investigate or offer Deputy Johnson any reasonable accommodations for her hearing impairment, nor did they direct Deputy Johnson to contact Defendant's ADA Coordinator regarding her request.

71.     Instead, they advised Deputy Johnson that many deputies use a radio earpiece to amplify radio traffic, and Sergeant Tutundzic showed Deputy Johnson some examples of options to try. Subsequently, Corporal Wheeler suggested a different style earpiece and sent a list of search results that were returned in response to a "Google" search he had conducted for "radio earpiece hearing aid." Sergeant Tutundzic and Corporal Wheeler told Deputy Johnson that she could purchase an earpiece at her own expense online. They also suggested that Deputy Johnson speak to other deputies they perceived as having hearing impairments to find out if they had any suggestions for her.

72.     In reality, the earpieces that Sergeant Tutundzic and Corporal Wheeler recommended are not designed to serve as auxiliary aids for hearing-impaired individuals. Instead, they are devices that amplify radio communications similar to the way earphones or earbuds amplify sound. The earpieces can be used by anyone and it is understood that Defendant regularly encourages all of its deputies to purchase and use them if desired to amplify radio communications, whether or not they are hearing-impaired. The earpieces would not have assisted Deputy Johnson

in hearing aurally-delivered communications over Defendant's intercom system or other communications in the Jail where she was unable to see and read the lips of the speaker.

73.     Nevertheless, desperate to keep her job, Deputy Johnson purchased several of these earpieces at her own expense, hoping they would help. Unsurprisingly, however, none of these devices provided adequate assistance in hearing and communicating over the radio in the Jail.

74.     Deputy Johnson also spoke with one of her colleagues, Deputy Newton, who also has a hearing impairment, about potential options. Deputy Newton explained that he sees an audiologist who prescribed a hearing aid for him and assisted him in locating a different style of earpiece that would help him hear radio traffic.

75.     Upon information and belief, and consistent with Defendant's policy and practice of discrimination against hearing-impaired deputies, Deputy Newton and other hearing-impaired deputies were required to purchase their auxiliary aids and earpieces at their own expense.

76.     Deputy Newton gave Deputy Johnson a business card for his audiologist and suggested that she try a different style earpiece than those that her supervisors had recommended. Although Deputy Johnson later tried the aid that Deputy Newton suggested, it was ineffective.

77.     Deputy Johnson had invested a significant amount of energy, time, and money obtaining the Jail Deputy position and had relocated with her three minor children from Texas to Colorado for the job. She very much wanted to find a solution that would allow her to hear and effectively communicate over the radios and intercoms and with the inmates in the Jail so that she had an equal opportunity enjoyed by her non-hearing-impaired counterparts in the terms, conditions and privileges of their employment with Defendant.

78.     On July 8, 2022, Deputy Johnson went to an audiologist on her own, at her own expense. The audiologist advised her that there were certain hearing aids that could be prescribed for her that could improve her ability to hear and communicate effectively in the jail environment. However, these hearing aids were not fully covered by the health insurance Defendant provided to Deputy Johnson and she would have been required to pay for the full cost of the hearing aids up front before seeking partial reimbursement from her insurance company.

79.     The hearing aids cost more than $5,000.

80.     Deputy Johnson could not afford to purchase the hearing aids at her own expense. Accordingly, on or about July 9, 2022, Deputy Johnson advised Defendant that she had tried four different earpieces but none of them were effective and her ability to hear was getting worse. Deputy Johnson explained that she met with an audiologist who recommended a specific type of hearing aid to allow her to hear and effectively communicate in the Jail, but that she could not afford to purchase the hearing aids on her own.

81.     Defendant did not offer to purchase the hearing aids that Deputy Johnson's audiologist had recommended for her, nor did Defendant offer any alternative accommodations that would have allowed Deputy Johnson to hear and effectively communicate in the jail environment.  Defendant did not engage in a good faith interactive process to determine if there was an auxiliary aid or aids that could be provided which would have allowed Deputy Johnson to perform her job as Jail Deputy.

82.     Instead, one of her training officers, Corporal Toby Williamson, met with Deputy Johnson and advised her that all deputies (whether or not they are hearing-impaired) are eligible for a subsidy every three years that could be used to offset some of the cost of hearing aids, should

Deputy Johnson choose to purchase them on her own. Alternatively, Corporal Williamson suggested that Deputy Johnson could purchase the hearing aids at her own expense and seek reimbursement from her insurance company to help cover the cost. Either option would still have required Deputy Johnson to pay thousands of dollars out of pocket to obtain the hearing aids.

83.    Upon information and belief, had Defendant provided the hearing aids recommended by her audiologist (or an alternative accommodation), Deputy Johnson would have been able to effectively communicate in her Jail Deputy position.

84.    However, because Defendant would not do so, and because Deputy Johnson could not afford to purchase the hearing aids herself, she requested reassignment to a comparable vacant job with Defendant beginning on or about July 9, 2022.

85.    Defendant did not provide Deputy Johnson with a list of vacant positions, nor did it advise her of anticipated vacancies in the near future. Instead, Sergeant Tutundzic told Deputy Johnson to "let [Defendant] know" if she learned of any vacant positions.

86.    Deputy Johnson did learn of a Records Technician position for which she was qualified and that she could have performed without accommodations. Given that she was not going to be provided an accommodation to hear in the Jail, Deputy Johnson asked Sergeant Tutundzic to reassign her to that job, which did not require that type of communication. Sergeant Tutundzic stated that the position was not vacant (even though it was being advertised as such on Defendant's website). In September 2022, Deputy Johnson saw another job on Defendant's website for an "After-Hours Caseworker" position for which she was qualified and that was in an office setting. Deputy Johnson could have performed that job without accommodations for her hearing impairment. This posting indicated that Defendant was accepting applications for this job.

Upon information and belief, this position was vacant during some or all times after Deputy Johnson began requesting reassignment, but Defendant did not inform her of the vacancy or consider reassigning Deputy Johnson to it.

87.     Deputy Johnson applied for the Caseworker position on or about September 19, 2022.

88.     Deputy Johnson received an email response on September 22, 2022 indicating that Defendant had "review[ed] all the applications" for that position and had decided to "move[] forward" with other candidates.

89.     Sergeant Tutundzic told Deputy Johnson that the only open positions were a maintenance position and a kitchen supervisor position, both of which were in the loud jail environment and would have required using the radio and intercom systems.

90.     Neither of these two positions were comparable to Deputy Johnson's job as a Jail Deputy. The salaries in both positions were significantly lower than the salary for the Jail Deputy position and both positions would have required the same auxiliary aids which Defendant had already refused to provide.

91.     Upon information and belief, other vacancies existed in positions that were comparable to the Jail Deputy position and/or that Deputy Johnson could have performed with or without accommodations. Defendant did not engage in good faith in the interactive process to determine if comparable jobs were available.

92.     Defendant's refusal to engage in good faith in the interactive process to provide her with a reasonable accommodation for her hearing disability made Deputy Johnson's work in the Jail setting hazardous and intolerable.

93.     Accordingly, Deputy Johnson had no other choice but to resign her employment with Defendant. She notified her supervisor, Sergeant Tutundzic, on or about November 13, 2022 that she was resigning because of her hearing impairment and the unsafe working environment it created without accommodations. Sergeant Tutundzic responded along the lines that she "understood" and she "knew that [Deputy Johnson] had tried her best to push through" despite her hearing impairment. Subsequently, Deputy Johnson submitted her formal resignation letter on November 16, 2022, in which she also indicated that she was forced to resign as a result of her hearing impairment because Defendant had not provided her with reasonable accommodations.

94.     Following her constructive termination, Deputy Johnson was forced to break her lease in Colorado and move herself and her three youngest children back to Texas to live near family while she looked for another job.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA
(42 U.S.C. §§ 12101, *et seq.*)

95.     Deputy Johnson incorporates and realleges her previous allegations as if fully set forth herein.

96.     During all relevant time periods, Defendant was an "employer" and a "covered entity" as defined by § 12111(2) and (5)(A) of the ADA.

97.     During all relevant time periods, Deputy Johnson was an "employee" of Defendant as that term is defined in § 12111(4) of the ADA.

98.     Deputy Johnson suffers from and/or has a record of high frequency and speech-range hearing loss in both ears, which is a physiological disorder or condition affecting the operation of her auditory system.

99.     Deputy Johnson requires auxiliary aids and utilizes lip-reading skills to perform the major life activities of hearing and communicating, and sometimes requires extra time to perform these functions as compared with most people in the general population. Thus, Deputy Johnson has a "disability" as that term is defined in § 12102 of the ADA and its implementing regulations, codified at 29 C.F.R. § 1630.2.

100.    During some or all of the relevant time periods, Defendant knew or reasonably should have known of Deputy Johnson's hearing disability.

101.    Deputy Johnson possesses the requisite skill, experience, education and other job-related requirements of the Jail Deputy position that she held with Defendant, as well as other employment positions with Defendant that she desired.

102.    Deputy Johnson was qualified to perform the essential functions of her Jail Deputy position and other available employment positions with Defendant with or without reasonable accommodations for her hearing disability.

103.    Deputy Johnson provided Defendant with adequate notice of her request for reasonable accommodations for her hearing disability in her Jail Deputy position during her employment, including but not limited to her requests to be provided with auxiliary aids to assist her with hearing and communicating in the jail environment.

104.    Deputy Johnson also provided adequate notice of her request for reassignment to a vacant position as a reasonable accommodation for her hearing disability after Defendant failed to

engage in good faith in the interactive process to provide her with auxiliary aids or services as a reasonable accommodation for her hearing disability in her Jail Deputy position.

105.    As part of its policy and practice of discrimination against individuals with hearing disabilities, Defendant discriminated against Deputy Johnson because of her hearing disability in the terms, conditions and privileges of her employment by failing to provide her with a reasonable accommodation for her disability.

106.    Specifically, Defendant failed to engage in good faith in the interactive process with Deputy Johnson to investigate or provide her with reasonable accommodations for her hearing disability that would allow her to perform the essential functions of the Jail Deputy position. Instead, Defendant directed Deputy Johnson to investigate and obtain auxiliary aids on her own and at her own expense and referred her to other hearing-impaired employees who were also required to investigate and obtain their own auxiliary aids for their disabilities.

107.    Defendant failed to evaluate whether Deputy Johnson's request for auxiliary aids as a reasonable accommodation for her disability constituted an undue hardship on Defendant's business operations before denying her requests.

108.    Defendant also failed to take reasonable steps to reassign Deputy Johnson to a comparable vacant position by failing to inform her of such vacancies or of vacancies that it reasonably anticipated would become available in the near future. Instead, Defendant failed to consider reassigning her to a vacant equivalent position at all and required her to compete with other individuals for such positions that she discovered on her own on Defendant's website. Defendant continued to seek applicants for those comparable vacant positions and/or hired other

individuals with Deputy Johnson's qualifications into those positions without considering her for reassignment to them as required by the ADA.

109.    Without having considered Deputy Johnson for those comparable vacant positions first, Defendant offered Deputy Johnson reassignment to lower-paying positions that, like the Jail Deputy position, required that she could hear and communicate effectively in the Jail and for which she would have required reasonable accommodations that Defendant was unwilling to investigate or provide.

110.    Defendant is liable for the acts and omissions of its agents and employees under the doctrine of *respondeat superior* and pursuant to § 12111(5)(A) of the ADA.

111.    Defendant's conduct has caused and will continue to cause Deputy Johnson significant damages, injuries, and losses.

## SECOND CLAIM FOR RELIEF
### DISCRIMINATION IN VIOLATION OF THE ADA
(42 U.S.C. §§ 12101, *et seq.*)

112.    Deputy Johnson incorporates and realleges her previous allegations as if fully set forth herein.

113.    During all relevant time periods, Defendant was an "employer" and a "covered entity" as defined by § 12111(2) and (5)(A) of the ADA.

114.    During all relevant time periods, Deputy Johnson was an "employee" of Defendant as that term is defined in § 12111(4) of the ADA.

115.    Deputy Johnson suffers from and/or has a record of high frequency and speech-range hearing loss in both ears, which is a physiological disorder or condition affecting the operation of her auditory system.

116.     Deputy Johnson requires auxiliary aids and utilizes lip-reading skills to perform the major life activities of hearing and communicating, and sometimes requires extra time to perform these functions as compared with most people in the general population. Thus, Deputy Johnson has a "disability" as that term is defined in § 12102 of the ADA and its implementing regulations, codified at 29 C.F.R. § 1630.2.

117.     During some or all of the relevant time periods, Defendant knew or reasonably should have known of Deputy Johnson's hearing disability.

118.     Deputy Johnson possesses the requisite skill, experience, education and other job-related requirements of the Jail Deputy position that she held with Defendant, as well as other employment positions with Defendant that she desired.

119.     Deputy Johnson was qualified to perform the essential functions of her Jail Deputy position and other available employment positions with Defendant with or without reasonable accommodations for her hearing disability. Thus, Deputy Johnson is a "qualified individual" as defined by the ADA.

120.     Defendant, by and through its agents, discriminated against Deputy Johnson in the terms, conditions and privileges of employment by limiting her in regard to job training and advancement opportunities, failing to provide her with effective auxiliary aids and services that would have allowed her to enjoy and participate fully and to compete on an equal basis with her non-hearing-impaired counterparts in all aspects of her employment with Defendant, denying her employment opportunities for which she was otherwise qualified, and/or constructively terminating her employment because of her hearing disability and/or the need for Defendant to provide her with reasonable accommodations for it.

23

121.    Defendant's discrimination against Deputy Johnson was part of its policy and practice of discrimination against individuals with hearing disabilities.

122.    Defendant's discrimination against Deputy Johnson was deliberate and, considered in its totality, created an unsafe working environment which made or allowed Deputy Johnson's working conditions to become so difficult or intolerable that Deputy Johnson had no other choice but to resign her employment with Defendant.

123.    A reasonable person under the same or similar circumstances as Deputy Johnson faced with the potential threat to his or her health and safety caused by Defendant's discrimination, would view Deputy Johnson's working conditions as intolerable.

124.    Deputy Johnson's hearing disability was a determining factor in the discriminatory actions she was subjected to by Defendant, including but not limited to the constructive termination of her employment.

125.    Defendant is liable for the acts and omissions of its agents and employees under the doctrine of *respondeat superior* and pursuant to § 12111(5)(A) of the ADA.

126.    Defendant's conduct has caused and will continue to cause Deputy Johnson significant damages, injuries, and losses.

## PRAYER FOR RELIEF

127.    Wherefore, Deputy Johnson requests that the Court enter judgment in her favor and against Defendant, in amounts to be proven at trial, including but not limited to:

a. Economic losses, including but not limited to back pay, in amounts to be determined at trial;

b.   Equitable relief, including but not limited to front pay (in lieu of reinstatement), in amounts to be determined at trial;

c.   Compensatory damages (including but not limited to travel and moving expenses and other consequential damages) in amounts to be determined at trial;

d.   Non-economic losses, including but not limited to emotional distress, pain and suffering, humiliation, inconvenience, and loss of enjoyment of life, and/or impairment of the quality of life in amounts to be determined at trial;

e.   Attorneys' fees and costs on all claims allowed by law;

f.   Pre- and post-judgment interest at the highest lawful rates; and

g.   Such further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

DATED this 8th day of February 2024.

Respectfully submitted,

GREISEN MEDLOCK, LLC                              JONES LAW, LLC


*s/ Paula Greisen*                               *s/ Kimberly Jones*
Paula Greisen                                     4 W. Dry Creek Circle, Suite 100
Scott Medlock                                     Littleton, CO 80120
6110 E. Colfax Avenue, Suite 4-216                (303) 551-1289
Denver, CO 80220                                  kim@jones-legal.com
(303) 876-7663
pg@greisenmedlock.com                             *Attorney for Plaintiff*
sm@greisenmedlock.com

*Attorneys for Plaintiff*

*Address of the Plaintiff:*

Jillian Johnson
5337 Worthy Way, Apt. 10112
Keller, TX  76244